POSNER, Circuit Judge,
dissenting in part.
I join the majority opinion except with respect to reversing the dismissal of the plaintiffs claim of housing discrimination. I have difficulty squaring that reversal with Ashcroft v. Iqbal, —— U.S.-, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009), unless Iqbal is limited to cases in which there is a defense of official immunity — especially if as in that case it is asserted by very high-ranking officials (the Attorney General of the United States and the Director of the FBI) — because the defense is compromised if the defendants have to respond to discovery demands in a case unlikely to have merit. Smith v. Duffey, 576 F.3d 336, 340 (7th Cir.2009); Robert G. Bone, “Plausibility Pleading Revisited and Revised: A Comment on Ashcroft v. Iqbal," 85 Notre Dame L.Rev. 849, 882 (2010); Howard M. Wasserman, “Iqbal, Procedural Mismatches, and Civil Rights Litigation,” 14 Lewis & Clark L.Rev. 157, 172-73 (2010).
The majority opinion does not suggest that the Supreme Court would limit Iqbal to immunity cases. The Court said that “our decision in Twombly [Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), the forerunner of Iqbal ] expounded the pleading standard for ‘all civil actions.’ ” 129 S.Ct. at 1953. It did add that a district judge’s promise of minimally intrusive discovery “provides especially cold comfort in this pleading context, where we are impelled to give real content to the concept of qualified immunity for high-level officials who must be neither deterred nor detracted from the vigorous performance of their duties.” Id. at 1954. But this seems just to mean that the Court thought Iqbal a strong case for application of the Twombly standard, rather than thinking it the only type of discrimination case to which the standard applies.
There is language in my colleagues’ opinion to suggest that discrimination cases are outside the scope of Iqbal, itself a discrimination case. The opinion says that “a plaintiff who believes that she has been passed over for a promotion because of her sex will be able to plead that she was employed by Company X, that a promotion was offered, that she applied and was qualified for it, and that the job went to someone else.” Though this is not a promotion case, the opinion goes on to say that “Swanson’s complaint identifies the type of discrimination that she thinks occurs (racial), by whom (Citibank, through Skertich, the manager, and the outside appraisers it used), and when (in connection with her effort in early 2009 to obtain a home equity loan). This is all that she needed to put in the complaint.” In contrast, “a more complex case involving financial derivatives, or tax fraud that the parties tried hard to conceal, or antitrust violations, will require more detail, both to give the opposing party notice of what the case is all about and to show how, in the plaintiffs mind at least, the dots should be connected.” The “more complex” case *408 to which this passage is referring is Twombly, an antitrust case. But Iqbal, which charged the defendants with having subjected Pakistani Muslims to harsh conditions of confinement because of their religion and national origin, was a discrimination case, as is the present case, and was not especially complex.
Suppose this were a promotion case, and several people were vying for a promotion, all were qualified, several were men and one was a woman, and one of the men received the promotion. No complexity; yet the district court would “draw on its judicial experience and common sense,” Ashcroft v. Iqbal, supra, 129 S.Ct. at 1950, to conclude that discrimination would not be a plausible explanation of the hiring decision, without additional allegations.
This case is even stronger for dismissal because it lacks the competitive situation'— man and woman, or white and black, vying for the same job and the man, or the white, getting it. We had emphasized this distinction, long before Twombly and Iqbal, in Latimore v. Citibank Federal Savings Bank, 151 F.3d 712 (7th Cir.1998), like this a case of credit discrimination rather than promotion. “Latimore was not competing with a white person for a $51,000 loan. A bank does not announce, We are making a $51,000 real estate loan today; please submit your applications, and we’ll choose the application that we like best and give that applicant the loan.’ ” Id. at 714. We held that there was no basis for an inference of discrimination. Noland v. Commerce Mortgage Corp., 122 F.3d 551, 553 (8th Cir.1997), and Simms v. First Gibraltar Bank, 83 F.3d 1546, 1558 (5th Cir.1996), rejected credit-discrimination claims because there was no evidence that similar applicants were treated better, and Boykin v. Bank of America Corp., 162 Fed.Appx. 837, 840 (11th Cir.2005) (per curiam), rejected such a claim because “absent direct evidence of discrimination, there is no basis for a trier of fact to assume that a decision to deny a loan was motivated by discriminatory animus unless the plaintiff makes a showing that a pattern of lending suggests the existence of discrimination.”
There is no allegation that the plaintiff in this case was competing with a white person for a loan. It was the low appraisal of her home that killed her chances for the $50,000 loan that she was seeking. The appraiser thought her home worth only $170,000, and she already owed $146,000 on it (a first mortgage of $121,000 and a home-equity loan of $25,000). A further loan of $50,000 would thus have been undersecured. We must assume that the appraisal was a mistake, and the house worth considerably more, as she alleges. But errors in appraising a house are common because “real estate appraisal is not an exact science,” Latimore v. Citibank Federal Savings Bank, supra, 151 F.3d at 715 — common enough to have created a market for “Real Estate Appraisers Errors & Omissions” insurance policies. See, e.g., OREP (Organization of Real Estate Professionals), “E&O Insurance,” www.orep.org/appraisers-e&o.htm (visited July 11, 2010). The Supreme Court would consider error the plausible inference in this case, rather than discrimination, for it said in Iqbal that “as between that ‘obvious alternative explanation’ for the [injury of which the plaintiff is complaining] and the purposeful, invidious discrimination [the plaintiff] asks us to infer, discrimination is not a plausible conclusion.” Ashcroft v. Iqbal, supra, 129 S.Ct. at 1951-52, quoting Twombly, 550 U.S. at 567, 127 S.Ct. 1955.
Even before Twombly and Iqbal, complaints were dismissed when they alleged facts that refuted the plaintiffs’ claims. See, e.g., Tierney v. Vahle, 304 F.3d 734, 740 (7th Cir.2002); Thomas v. Farley, 31 *409 F.3d 557 (7th Cir.1994); Lightner v. City of Wilmington, 545 F.3d 260, 262 (4th Cir.2008). Under the new regime, it should be enough that the allegations render a claim implausible. The complaint alleges that Citibank was the second bank to turn down the plaintiffs application for a home-equity loan. This reinforces the inference that she was not qualified. We further learn that, subject to the appraisal, which had not yet been conducted, Citibank had approved the $50,000 home-equity loan that the plaintiff was seeking on the basis of her representation that her house was worth $270,000. But she didn’t think it was worth that much when she applied for the loan. The house had been appraised at $260,000 in 2004, and the complaint alleges that home values had fallen by “only” 16 to 20 percent since. This implies that when she applied for the home-equity loan her house was worth between $208,000 and $218,400 — much less than what she told Citibank it was worth.
If the house was worth $208,000, she would have owed a total of $196,000 had she gotten the loan, or just a shade under the market value of the house. If the bank had insisted that she have a 20 percent equity in the house, which would be $41,600, it would have lent her only $20,400 ($166,400 — -80 percent of $208,000 — minus the $146,000 that she already owed on the house). The loan figure rises to $28,720 if the house was worth $218,400 rather than $208,000. In either case a $50,000 loan would have been out of the question, especially in the wake of the financial crash of September 2008, when credit, including home-equity credit, became extremely tight. E.g., Bob Tedeschi, “Opening the Tap on Home Equity,” N.Y. Times, Nov. 7, 2008, p. RE9, www.nytimes.com/2008/11/02/realestate/02mort.html. For it was a home-equity loan that the plaintiff was seeking in early February of 2009, at the nadir of the economic collapse — and seeking it from troubled Citibank, one of the banks that required a federal bailout in the wake of the crash. Financial reports in the weeks surrounding the plaintiffs application make clear the difficulty of obtaining credit from Citibank during that period. See Binyamin Appelbaum, “Despite Federal Aid, Many Banks Fail to Revive Lending,” Wash. Post, Feb. 3, 2009, www.washingtonpost.com/wp-dyn/content/article/2009/02/02/AR2009020203338_pf. html (“some of the first banks to get funding, such as Citigroup and J.P. Morgan Chase, have reported the sharpest drops in lending”); Liz Moyer, “Banks Promise Loans but Hoard Cash,” Forbes.com, Feb. 3, 2009, www.forbes.com/2009/02/03/ banking-federal-reserve-business-wall-street-0203_loans.html (“ ‘banks and other lenders have tightened access to credit and are conserving capital in order to absorb the losses that occur when borrowers default,’ the company [Citibank] said: ‘Citi will not and cannot take excessive risk with the capital the American public and other investors have entrusted to the company’ ”); Mara Der Hovanesian & David Henry, “Citi: The Losses Keep Coming,” Bloomberg BusinessWeek, Jan. 12, 2009, www.businessweek.com/bwdaily/dnflash/content/jan2009/db20090112_136301.htm? campaign-id=rss_daily (“banks are not lending. They are using every opportunity to pull loans and force liquidations”). (All web sites were visited on July 11, 2010.)
In Erickson v. Pardus, 551 U.S. 89, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) (per curiam), decided two weeks after Twombly, the Supreme Court, without citing Twombly, reinstated a prisoner’s civil rights suit that had been dismissed on the ground that the allegations of the complaint were “conclusory.” The suit had charged deliberate indifference to the plaintiffs need for medical treatment. In *410 the key passage in the Court’s opinion, we learn that “the complaint stated that Dr. Bloor’s decision to remove the petitioner [that is, the plaintiff] from his prescribed hepatitis C medication was ‘endangering [his] life.’ It alleged this medication was withheld ‘shortly after’ petitioner had commenced a treatment program that would take one year, that he was ‘still in need of treatment for this disease,’ and that the prison officials were in the meantime refusing to provide treatment. This alone was enough to satisfy Rule 8(a)(2). Petitioner, in addition, bolstered his claim by making more specific allegations in documents attached to the complaint and in later filings” (emphasis added, record citations omitted). It was reasonable to infer from these allegations, assuming their truth, that the defendants (who included Dr. Bloor, a prison doctor) had acted with deliberate indifference to the petitioner’s serious medical need by refusing to provide him with any medical treatment after taking away his medication. Indeed it’s difficult (again assuming the truth of the allegations) to imagine an alternative interpretation. Hepatitis C is a serious disease and the prisoner had been put in a treatment program expected to last a year. To refuse him any treatment whatsoever seemed (as the other allegations to which the Court referred confirmed) to be punitive. I think Erickson is good law even after Iqbal, but I also think it’s miles away from a case in which all that’s alleged (besides pure speculation about the defendants’ motive) is that someone was denied a loan because her house was mistakenly appraised for less than its market value.
The majority opinion relies heavily on Swierkiewicz v. Sorema N.A., 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002), cited with approval in Twombly, see 550 U.S. at 556, 127 S.Ct. 1955 (though not cited in Iqbal) and not overruled. Although it is regarded in some quarters as dead after Iqbal, e.g., Fowler v. UPMC Shadyside, 578 F.3d 203, 211 (3d Cir.2009); Suja A. Thomas, “The New Summary Judgment Motion: The Motion to Dismiss Under Iqbal and Twombly,” 14 Lewis & Clark L.Rev. 15, 35 (2010), lower-court judges are not to deem a Supreme Court decision overruled even if it is plainly inconsistent with a subsequent decision. State Oil Co. v. Khan, 522 U.S. 3, 118 S.Ct. 275, 139 L.Ed.2d 199 (1997); Agostini v. Felton, 521 U.S. 203, 237, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997); Rodriguez de Quijas v. Shearson/American Express, Inc., 490 U.S. 477, 484, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989); National Rifle Ass’n v. City of Chicago, 567 F.3d 856, 857-58 (7th Cir.2009), reversed under the name McDonald v. City of Chicago, —- U.S. -, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010). But that principle is not applicable here; Swierkiewicz is distinguishable.
The Court rejected a rule that the Second Circuit had created which required “heightened pleading” in Title VII cases. The basic requirement for a complaint (“a short and plain statement of the claim showing that the pleader is entitled to relief’) is set forth in Rule 8(a)(2) of the Federal Rules of Civil Procedure. Rule 9 requires heightened pleading (that is, a specific allegation) of certain elements in particular cases, such as fraud and special damages. There is no reference to heightened pleading of discrimination claims, however, and Swierkiewicz holds that the judiciary is not authorized to amend Rule 9 without complying with the procedures in the Rules Enabling Act. 534 U.S. at 513-15, 122 S.Ct. 992; Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 168-69, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993); Saritha Komatireddy Tice, Note, “A ‘Plausible’ Explanation of Pleading Standards: Bell Atlantic Corp. v. Twombly,” 31 Harv. J.L. *411 & Pub. Pol’y 827, 832 n. 49 (2008). As the Court explained in Twombly, “Sivierkiewicz did not change the law of pleading, but simply re-emphasized ... that the Second Circuit’s use of a heightened pleading standard for Title VII cases was contrary to the Federal Rules.” 550 U.S. at 570, 127 S.Ct. 1955. But Title VII cases are not exempted by Sivierkieioicz from the doctrine of the Iqbal case. Iqbal establishes a general requirement of “plausibility” applicable to all civil cases in federal courts.
It does so, however, in opaque language: “The plausibility standard is not akin to a ‘probability requirement,’ but it asks for more than a sheer possibility that a defendant has acted unlawfully.” 129 S.Ct. at 1949. In statistics the range of probabilities is from 0 to 1, and therefore encompasses “sheer possibility” along with “plausibility.” It seems (no stronger word is possible) that what the Court was driving at was that even if the district judge doesn’t think a plaintiffs case is more likely than not to be a winner (that is, doesn’t think p > .5), as long as it is substantially justified that’s enough to avert dismissal. Cf. Equal Access to Justice Act, 28 U.S.C. § 2412(d)(1)(A). But when a bank turns down a loan applicant because the appraisal of the security for the loan indicates that the loan would not be adequately secured, the alternative hypothesis of racial discrimination does not have substantial merit; it is implausible.
Behind both Twombly and Iqbal lurks a concern with asymmetric discovery burdens and the potential for extortionate litigation (similar to that created by class actions, to which Rule 23(f) of the civil rules was a response, Isaacs v. Sprint Corp., 261 F.3d 679, 681 (7th Cir.2001); Blair v. Equifax Check Services, Inc., 181 F.3d 832, 834-35 (7th Cir.1999); Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154, 162-65 (3d Cir.2001); Vallario v. Vandehey, 554 F.3d 1259, 1263 (10th Cir.2009); Fed.R.Civ.P. 23(f) Committee Note) that such an asymmetry creates. Ashcroft v. Iqbal, supra, 129 S.Ct. at 1953; Bell Atlantic Corp. v. Twombly, supra, 550 U.S. at 557-59, 127 S.Ct. 1955; Cooney v. Rossiter, 583 F.3d 967, 971 (7th Cir.2009); Beck v. Dobrowski, 559 F.3d 680, 682 (7th Cir.2009); Kendall v. Visa U.S.A, Inc., 518 F.3d 1042, 1046-47 (9th Cir.2008). In most suits against corporations or other institutions, and in both Twombly and Iqbal — but also in the present case — the plaintiff wants or needs more discovery of the defendant than the defendant wants or needs of the plaintiff, because the plaintiff has to search the defendant’s records (and, through depositions, the minds of the defendant’s employees) to obtain evidence of wrongdoing. With the electronic archives of large corporations or other large organizations holding millions of emails and other electronic communications, the cost of discovery to a defendant has become in many cases astronomical. And the cost is not only monetary; it can include, as well, the disruption of the defendant’s operations. If no similar costs are borne by the plaintiff in complying with the defendant’s discovery demands, the costs to the defendant may induce it to agree early in the litigation to a settlement favorable to the plaintiff.
It is true, as critics of Twombly and Iqbal point out, that district courts have authority to limit discovery. E.g., Griffin v. Foley, 542 F.3d 209, 223 (7th Cir.2008); Searls v. Glasser, 64 F.3d 1061, 1068 (7th Cir.1995); Deitchman v. E.R. Squibb & Sons, Inc., 740 F.2d 556, 563 (7th Cir.1984); Mwani v. bin Laden, 417 F.3d 1, 17 (D.C.Cir.2005). But especially in busy districts, which is where complex litigation is concentrated, the judges tend to delegate that authority to magistrate judges. And because the magistrate judge to whom a *412 case is delegated for discovery only is not responsible for the trial or the decision and can have only an imperfect sense of how widely the district judge would want the factual inquiry in the case to roam to enable him to decide it, the magistrate judge is likely to err on the permissive side. “One common form of unnecessary discovery (and therefore a ready source of threatened discovery) is delving into ten issues when one will be dispositive. A magistrate lacks the authority to carve off the nine unnecessary issues; for all the magistrate knows, the judge may want evidence on any one of them. So the magistrate stands back and lets the parties have at it. Pursuit of factual and legal issues that will not matter to the outcome of the case is a source of enormous unnecessary costs, yet it is one hard to conquer in a system of notice pleading and even harder to limit when an officer lacking the power to decide the case supervises discovery.” Frank H. Easterbrook, “Discovery as Abuse,” 69 B.U. L.Rev. 635, 639 (1989); see also Milton Pollack, “Discovery — Its Abuse and Correction,” 80 F.R.D. 219, 223 (1979); Virginia E. Hench, “Mandatory Disclosure and Equal Access to Justice: The 1993 Federal Discovery Rules Amendments and the Just, Speedy and Inexpensive Determination of Every Action,” 67 Temple L.Rev. 179, 232 (1994).
This structural flaw helps to explain and justify the Supreme Court’s new approach. It requires the plaintiff to conduct a more extensive precomplaint investigation than used to be required and so creates greater symmetry between the plaintiffs and the defendant’s litigation costs, and by doing so reduces the scope for extortionate discovery. If the plaintiff shows that he can’t conduct an even minimally adequate investigation without limited discovery, the judge presumably can allow that discovery, meanwhile deferring ruling on the defendant’s motion to dismiss. Miller v. Gammie, 335 F.3d 889, 899 (9th Cir.2003) (en banc); Coss v. Playtex Products, LLC, No. 08 C 50222, 2009 WL 1455358 (N.D.Ill. May 21, 2009); Edward A. Hartnett, “Taming Twombly, Even After Iqbal,” 158 U. Pa. L.Rev. 473, 507-14 (2010); Suzette M. Malveaux, “Front Loading and Heavy Lifting: How Pre-Dismissal Discovery Can Address the Detrimental Effect of Iqbal on Civil Rights Cases,” 14 Lewis & Clark L.Rev. 65 (2010). No one has suggested such a resolution for this case.
The plaintiff has an implausible case of discrimination, but she will now be permitted to serve discovery demands that will compel elaborate document review by Citibank and require its executives to sit for many hours of depositions. (Not that the plaintiff is capable of conducting such proceedings as a pro se, but on remand she may' — indeed she would be well advised to — ask the judge to help her And a lawyer.) The threat of such an imposition will induce Citibank to consider settlement even if the suit has no merit at all. That is the pattern that the Supreme Court’s recent decisions are aimed at disrupting.
We should affirm the dismissal of the suit in its entirety.