Joyce SALLION, Plaintiff,

v.

SUNTRUST BANK, ATLANTA, f/k/a Trust Company Bank; and Beverly Wittler, in her individual and agency capacities, Defendants.

No. Civ.A.1:96CV1500RWS.

United States District Court,
N.D. Georgia,
Atlanta Division.

Feb. 29, 2000.

Georgia Kay Lord, Nelson, Hill, Lord & Beasley, Decatur, GA, for plaintiff.

William Henry Major, III, Allen William Nelson, David Hunt Wilson, Anthony Paul Tatum, Hawkins & Parnell, Atlanta, GA, for defendants.

## *MEMORANDUM OPINION & ORDER*

STORY, District Judge.

Plaintiff Joyce Sallion brings this action alleging Defendant SunTrust Bank, Atlanta, f/k/a Trust Company Bank ("Sun-Trust") rejected her application for a loan based on her race and marital status in violation of 42 U.S.C. § 1981, 42 U.S.C. § 1982, and the Equal Credit Opportunity Act, 15 U.S.C. § 1691 et seq. ("ECOA"). In addition, Sallion alleges Defendant Beverly Wittler, a SunTrust loan originator, also violated ECOA by providing her with less assistance in the preparation of her loan file than what Wittler normally provided to loan applicants outside the protected classes. Before the Court is Defendants' Motion for Summary Judgment [39–1]. After reviewing the entire record and considering all arguments of the parties, the Court enters the following Order.

## I. Factual Background

In 1994 Sallion contacted Beverly Wittler, a loan originator, to discuss the possibility of qualifying in advance for a loan to construct a house on a lot she and her husband purchased. After reviewing Sallion's financial information, Wittler testified she recommended Sallion apply for a loan in the amount of $108,000, but Sallion allegedly ignored the recommendation and directed Wittler to submit a loan application for $132,000. (Def.'s Ex. A., Wittler Aff. ¶ 9.) Sallion disagrees, explaining "What I asked for was for them to tell me how much house I could afford; and on the basis of that, then I would select the house that I wanted." (Sallion Dep. at 64.) According to Sallion's testimony, Wittler proposed a loan amount of $132,250 to Sallion, who apparently never objected, and Wittler submitted the loan for this amount. (*Id.* at 103, 108.)

On August 3, 1994, Nancy Wallis, a SunTrust underwriter, denied Sallion's application for a loan of $132,250 allegedly because she did not qualify for the loan due to (1) insufficient verifiable income, (2) an unacceptable debt to income ratio, (3) delinquent credit obligations, and (4) insufficient closing funds. (Pl.'s Ex. 7 at 100001–003.) This determination rested in part on the finding Sallion had failed to verify monthly income of $1500 from a recent divorce. Ellen Lighton, also a SunTrust underwriter, reviewed the application and agreed with Wallis's decision. (Lighton Dep. at 24.)

Wittler then obtained Sallion's handwritten explanation of her credit history and resubmitted Sallion's application to underwriting. (Wittler Dep. at 39.) Lighton denied the resubmitted application on August 18, noting that even if Sallion could submit sufficient verification of her alleged $1500 monthly alimony income, her debt to income ratios would still exceed banking guidelines. (Pl.'s Ex. 7 àt 100004; Lighton Aff. ¶¶ 16–17.) Based on the loan amount and Sallion's slow payment credit history, Lighton also concluded the bank required

more closing funds and reserve funds than Sallion possessed. (Pl.'s Ex. 7 at 100004; Lighton Aff. ¶¶ 19–21.) Set forth below is a more detailed explanation of SunTrust's proffered reasons and Sallion's responses thereto.

## A. Insufficient Verifiable Income

SunTrust did not consider the $1500 alimony payment because Sallion could not provide proof she received the payments consistently over the previous twelve months. Under the terms of the divorce decree, the payments did not begin until April 1994, just four months before Sallion submitted her loan application to SunTrust. Sallion thus failed to satisfy the following SunTrust underwriting guideline:

1. Child Support/Alimony

   A copy of the executed divorce decree, property settlement agreement and/or separation agreement reflecting the amount and duration of the payment is required.

   It will also be necessary to substantiate receipt of the amounts specified therein; and the income in question must continue for at least three years. A copy of the court transcript if paid through the courts is considered acceptable proof of receipt. If the payments are not made through the courts, copies of canceled checks or validated deposit slips showing regular deposits of said income for the last 12 months are acceptable verification of receipt.

(Pl.'s Ex. 11 at 285.) Sallion admits she cannot show receipt of payment for twelve months, but argues the verification requirement violates ECOA's proscription of discrimination based on marital status because it establishes more stringent standards of verification for alimony than other types of income. (Resp.Br. at Part III(D).)

## B. Insufficient Closing Funds

It is undisputed Sallion lacked $650 of the $16,936.10 she needed to close the $132,250 loan. Sallion's complaint is that SunTrust never informed her of this con-

cern before rejecting her application, thus denying her the opportunity to increase her available funds by collecting $3000 from her son as payment for a loan she gave him. (Sallion Aff. ¶ 9.) In addition, Sallion argues her closing and reserve funds would have been sufficient had SunTrust been more flexible and considered her for a smaller loan.

## C. Credit History

Sallion admits her credit report contained some late payments and one charged-off debt, but contends SunTrust did not deny her loan application based on her alleged poor credit history. (Pl.'s Ex. 8 at 200048.) Two pieces of evidence allegedly support this contention. First, SunTrust's statement of credit denial sent to Sallion when SunTrust rejected the loan application for the second time states "The Credit Reporting Agency information on you did not influence our decision." (Pl.'s Ex. 7 at 100002.) Second, SunTrust's loan files allegedly show the bank extended credit to many white applicants with poorer credit histories. (Pl.'s Exs. 24–30.)

## D. Debt to Income Ratios

After SunTrust concluded Sallion's alimony payment of $1500 was unverifiable and thus could not be considered for purposes of the loan application, it recalculated Sallion's debt to income ratios and found they exceeded SunTrust's guidelines. Sallion does not attack the correctness of the calculations, but advances instead the argument described above that SunTrust's verification requirements for alimony payments violate ECOA. Sallion also alleges this proffered reason is unworthy of belief because at the time of the application denial SunTrust "approv[ed] numerous loan applications which reflected poorer ratios and poorer credit, as well as applications with more significant problems regarding verification of income." (Pl.'s Resp. to Defs.' Facts ¶ 7.)

### E. Additional Evidence of Discrimination

Aside from arguing the underwriters' proffered reasons for denying the loan are pretextual, Sallion also blames Wittler for the denial, claiming Wittler failed to (1) inform underwriters Sallion did not demand any certain loan amount, and (2) provide the underwriters with additional information about Sallion that would have increased her chances of receiving the loan. In addition, Sallion claims Wittler provided her with a lower level of service than she provided white applicants.

### II. Discussion

A district court shall grant summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is (1) no genuine issue as to any material fact and that (2) the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). The trial judge should not weigh the evidence to determine the truth of the matter but should only determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). The moving party is entitled to summary judgment when, after adequate time for discovery, the nonmoving party completely fails to prove an essential element of his case with respect to which he has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

■ Sallion's claims are best analyzed under the methods of proof used in employment discrimination claims.[1] Sallion may therefore prove her claims by direct evidence of discriminatory intent, statistical proof of a discriminatory pattern and practice, or by circumstantial evidence through application of the *McDonnell–Douglas* framework. Sallion has submitted both direct evidence and circumstantial evidence in support of her marital status discrimination claim and circumstantial evidence only in support of her race discrimination claim. The Court will therefore consider Sallion's direct evidence of marital status discrimination first, then analyze Sallion's circumstantial evidence of racial and marital status discrimination together through application of the *McDonnell–Douglas* test.

### A. Direct Evidence of Marital Status Discrimination

Sallion alleges SunTrust's underwriting guidelines are facially discriminatory because they impose more stringent verification requirements on alimony income than other types of income, thereby treating alimony recipients less favorably than others based solely on their marital status. Section 1691(a)(1) of ECOA proscribes discrimination by creditors against applicants on the basis of marital status. Regulations promulgated thereunder by the Federal Reserve Bank state, in pertinent part, that "[w]hen an applicant relies on alimony .... in applying for credit, the creditor shall consider such payments as income to the extent that they are likely to be consistently made." 12 C.F.R. § 202.6(b)(5).

---

1. Over ten years ago the Supreme Court instructed courts to apply Title VII's "carefully designed framework of proof" in the context of section 1981 discrimination claims. *Patterson v. McLean Credit Union*, 491 U.S. 164, 109 S.Ct. 2363, 2377–2378, 105 L.Ed.2d 132 (1989). Courts within the Eleventh Circuit have applied the *McDonnell–Douglas* burden shifting analysis to analyze section 1982 claims. *See Farrior v. H.J. Russell & Co.*, 45 F.Supp.2d 1358, 1367 (N.D.Ga.1999); *Bell v. Mike Ford Realty Co.*, 857 F.Supp. 1550 (S.D.Ala.1994). Courts also use this framework of proof to resolve claims of discrimination under the ECOA. *See Moore v. United States Dep't of Agric.*, 55 F.3d 991, 994 (5th Cir.1995) (implying *McDonnell–Douglas* framework would apply but for fact plaintiffs presented direct evidence of discrimination); *Mercado–Garcia v. Ponce Federal Bank*, 979 F.2d 890, 893 (1st Cir.1992) (applying *McDonnell–Douglas* framework to ECOA claim); *but see Latimore v. Citibank Federal Savings Bank*, 151 F.3d 712, 713–15 (7th Cir. 1998) (concluding *McDonnell–Douglas* should not be applied in ECOA context).

SunTrust underwriting guidelines describe the requirements for verification of alimony income as follows:

### I. Other Miscellaneous Income

1. Child Support/Alimony

A copy of the executed divorce decree, property settlement agreement and/or separation agreement reflecting the amount and duration of the payment is required.

It will also be necessary to substantiate receipt of the amounts specified therein; and the income in question must continue for at least three years. A copy of the court transcript if paid through the courts is considered acceptable proof of receipt. If the payments are not made through the courts, copies of canceled checks or validated deposit slips showing regular deposits of said income for the last 12 months are acceptable verification of receipt.

(Pl.'s Ex. 11 at 37.) Sallion listed on her application receipt of two alimony payments per month in the amounts of $102.50 and $1500.00 for a total monthly alimony income of $1602.50. (Pl.'s Ex. 7 at 100041.) SunTrust deemed both sources of alimony income unverified under the above-quoted guidelines and thus did not consider them when deciding whether Sallion qualified for the loan.

Bank officials allegedly did not consider the smaller $102.50 payment because Sallion never remitted a copy of the divorce decree. Sallion disagrees, stating she provided Wittler with a copy of the divorce decree "[a]t some point during the application process." (Sallion Aff. ¶ 8.) While a factual dispute exists as to whether SunTrust ever received the decree, Sallion does not allege SunTrust's policy of requiring the decree for verification is discriminatory, and the decision to deem the $102.50 monthly income unverified is therefore irrelevant to the present analysis.

██ SunTrust classified the $1500 monthly income as unverified because Sallion could not substantiate receipt of payment for one year as SunTrust's underwriting guidelines require; Sallion did not receive her first payment under the 1994 divorce decree until April 1994 and thus could only substantiate receipt of payment for two months. Sallion alleges this proof of payment requirement is a "rigid rule[ ]" that SunTrust "does not impose on other forms of income." The only evidence offered in support of this allegation, however, are three instances when SunTrust approved loan applications despite the applicant's recent commencement of employment with a new employer. (Resp.Br. at 21.) No reasonable juror could review this evidence in addition to the remainder of the record and conclude SunTrust maintained a policy of discriminating against divorcees.

Sallion never mentions the fact SunTrust imposes this same receipt-of-payment requirement on loan applicants who receive every type of income not considered to be wages or salary. Indeed, loan applicants must confirm receipt of payment for (1) at least three years for income derived from notes or mortgages, (2) at least two years for income from interest, dividends, and trusts, or tips, and (3) at least one year for income from social security disability, retirement, interest, and dividends. (Pl.'s Ex. 11 at 285–87.) Because SunTrust consistently imposes proof-of-receipt requirements in these more analogous areas of income, no reasonable juror could find SunTrust's alimony verifications requirements are discriminatory based on the sole fact employment income is subject to more lenient verification standards.

### B. Circumstantial Evidence of Racial and Marital Status Discrimination

Both parties agree the Court should utilize the *McDonnell–Douglas* framework to analyze the propriety of SunTrust's decision to deny Sallion's loan application. When adjusted to fit the context of the

case sub judice, the framework is as follows:

> [Sallion] must first make out a prima facie case by showing: "1) that [s]he is a member of a protected class; 2) that [s]he applied for and was qualified for a loan from the defendant; 3) that the loan was rejected despite h[er] qualifications; and 4) that the defendant continued to approve loans for applicants with qualifications similar to the plaintiffs." *Milton v. Bancplus Mortgage Corp.,* No. 96 C 106, 1996 WL 197532 *2 (N.D.Ill. April 19, 1996) (citations omitted). Once the plaintiff makes the prima facie case, the burden "shifts to the defendant to articulate a legitimate, nondiscriminatory reason for taking the action it did against plaintiff." *Sayers v. General Motors Acceptance Corp.,* 522 F.Supp. 835, 840 (W.D.Mo.1981); *See* Thomas, *Defending an ECOA Claim,* at 112 (same). Finally, if the lender comes forward with a legitimate, nondiscriminatory reason for denying the applicant credit, the applicant then must show that these reasons are just a pretext for discrimination. *See Saldana [v. Citibank],* No. 93 C 4164, 1996 WL 332451 *3 (Applicant may still prevail is she can prove by a preponderance of the evidence that a discriminatory reason more likely motivated the bank or that the bank's proffered explanation is unworthy of credence or is a pretext for discrimination.)

*AB & S Auto Serv., Inc. v. South Shore Bank of Chicago,* 962 F.Supp. 1056, 1060 n. 6 (N.D.Ill.1997).

The problem, however, is this analysis focuses almost exclusively on the question whether the applicant was qualified for the loan. This is because banks presumably loan money to all applicants who qualify, unlike employers who usually make their selection from a host of qualified candidates. Consequently, by proving qualification for the loan, an ECOA plaintiff satisfies the second element of the prima facie case and, at the same time, casts sufficient doubt on the bank's proffered legitimate reason that he or she was not qualified.

Regardless of the terms in which it is couched, the undisputed evidence in the case sub judice reveals Sallion was not qualified for the loan. In addition, the evidence does not support a finding SunTrust treated similarly situated loan applicants who are not members of the protected classes more favorably. Sallion has therefore failed to satisfy elements two and four of her prima facie case and, at the same time, has failed to either cast sufficient doubt on SunTrust's proffered legitimate, nondiscriminatory reasons or show a discriminatory reason more likely motivated SunTrust to reject her loan.

### 1. SunTrust's Proffered Explanation

■ SunTrust has presented evidence detailed in part one of this Order that it rejected Sallion's loan application of $132,250 not because of her race or marital status but, instead, because she was unqualified due to (1) insufficient verifiable income, (2) an unacceptable debt to income ratio, (3) delinquent credit obligations, and (4) insufficient closing funds. (Pl.'s Ex. 7 at 100001–003.) Reasonable jurors could not, after reviewing the record, disagree with SunTrust's conclusion Sallion was not qualified for the loan. Sallion has thus failed to satisfy prong two of her prima facie case and failed to cast sufficient doubt on SunTrust's legitimate, nondiscriminatory reasons.

*a. Insufficient Verifiable Income.* The Court has already concluded SunTrust's verification policy for alimony income is not discriminatory, *see supra* pp. 1327–28, and it is undisputed Sallion's monthly income was insufficient absent the unverified alimony income of $1500 per month.

*b. Unacceptable Debt to Income Ratio.* There is no colorable argument Sallion even came close to satisfying SunTrust's loan ratio requirements; instead, the undisputed evidence reveals Sallion's loan ratios alone disqualified her for the loan. When both the $1500 alimony income and the $102.32 alimony income are removed

from consideration, Sallion's mortgage payment ratio is 52.6% and her total debt ratio is 64.6%, (Pl.'s Ex. 10), which exceeds SunTrust's target ratios of 28% and 36% by a colossal margin. Adding the $102.32 monthly alimony payment to Sallion's income, and thus assuming it is verifiable, only decreases the ratios to 50% and 59%. (*See* Pl.'s Ex. 7 at 100003.)

There is no evidence to suggest any loan applicant similarly situated in terms of front and back ratios received loan approval from SunTrust. Of the nineteen loan files Sallion has submitted, SunTrust approved no loans with a front ratio of 50% or more (the highest is 38%), and approved only one loan from a white male applicant with a back ratio of 59% or more. (*See* Resp.Br. at 14–16.) But there exists no substantial similarity between Sallion and that applicant because (1) his front ratio was 38% as compared to Sallion's 50%, (2) SunTrust conditioned loan approval upon the applicant paying off a debt that accounted for $300 of his monthly expenses, and (3) SunTrust initially qualified the applicant based on a monthly income calculated using a future raise, which decreased the back ratio to 37.8%; when a bank official realized this, she ordered another official to "[c]ontact co-borrower for employment info and verify...." (Pl.'s Ex. 34.)

Sallion complains the underwriters did not take into consideration the tax-exempt nature of her retirement income when calculating her loan ratios, which SunTrust's underwriting guidelines permits. (Pl.'s Ex. 11 at 284). She also points out that SunTrust took this factor into account for at least one white borrower. (Resp.Br. at 5.) This evidence neither suggests a discriminatory motive nor proves Sallion was qualified for the loan. First, there is no evidence Sallion ever informed bank officials of the tax-exempt nature of her retirement income, and nothing in the record suggests bank officials should have discovered this fact on their own from the face of Sallion's application. Reasonable jurors could therefore only speculate that the underwriters knew this fact but chose to ignore it in an effort to disguise their discriminatory rejection of her application. Second, Sallion has not provided the Court with either (1) the amount of tax savings that should have been added to her gross monthly income for underwriting purposes or (2) the adjusted loan ratios based upon said adjusted gross income figure. Absent this information, the Court cannot discern whether the adjusted loan ratios would have compared favorably with applicants outside the protected classes who received loan approval.

*c. Delinquent Credit Obligations.* Because SunTrust's second denial of credit to Sallion stated Sallion's credit history did not influence the underwriters' decision to reject the loan, reasonable jurors could find this proffered reason did not play a role in SunTrust's decision.

*d. Insufficient Closing Funds.* Sallion admits she did not have sufficient, readily-available funds to close, but argues (1) SunTrust should have approved her for a smaller loan for which her funds would have been sufficient to close, (2) since she lacked only $650, the bank should have notified her it would approve the loan application if she raised the needed funds, and (3) SunTrust should have asked Sallion to cash in her life insurance policy or demand repayment from her son of a $3000 loan in order to raise the needed funds.

As to the first argument, the Court has concluded no evidence in the record suggests SunTrust ever approves loans for less than the specific amount stated on the application. *See infra* p. 1331. The second and third contentions are unpersuasive because SunTrust would not have approved the loan even if Sallion raised the additional funds because of her unacceptable loan ratios.

## 2. No Similarly–Situated Applicants Approved

Sallion has also failed to satisfy prong four of her prima facie case because she has not established SunTrust approved

the loan application of any similarly situated applicant who is not a member of the protected classes. To establish substantial similarity, Sallion does not have to find an exact match between her application and applicants outside the protected classes who received loans, but comparator loan files must be significantly parallel in every material respect. *See Jones v. Bessemer Carraway Medical Center*, 137 F.3d 1306, 1311 (11th Cir.1998) (citation omitted) (plaintiff must show comparators are "similarly situated in all relevant respects...."). Sallion never offers a thorough comparison but, instead, presents only snapshots of comparator loan files in an attempt to create a sense of substantial similarity where none really exists. (Resp.Br. at 14–16; Reply Br. at 11–14; Pl.'s Exs. 24–42.)

### 3. Attempt to Show Discriminatory Reason More Likely Motivated the Decision

■ Once a plaintiff has satisfied all of the prima facie elements, she may establish pretext either "directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir.1997), *cert. denied*, 522 U.S. 1045, 118 S.Ct. 685, 139 L.Ed.2d 632 (1998) (quoting *Texas Dep't. of Community Affairs v. Burdine*, 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981)). Because reasonable jurors could not find Sallion was qualified for the loan, Sallion obviously cannot satisfy the prima facie elements of her case or establish pretext indirectly by showing SunTrust's proffered reasons are unworthy of belief. But even if one assumes Sallion could get past the prima facie elements, the Court also finds no evidence to support a finding that a discriminatory reason more likely motivated SunTrust's rejection of the loan application.

Sallion attempts to show a discriminatory reason more likely motivated the decision by alleging SunTrust acted out of the ordinary when it rejected the loan application for $132,250 instead of qualifying Sallion for some unspecified, lower amount more suitable to her financial profile. According to Sallion, SunTrust's failure to do so would lead a factfinder to only one conclusion: SunTrust did not want to qualify her for a loan because of her race and marital status. Having reviewed the evidence Sallion presents in support of this allegation, the Court concludes no reasonable juror could find this contention to be true.

Sallion argues the bank should have qualified her for an unspecified amount less than $132,250 because Sallion informed Wittler she simply wanted to know the highest loan amount for which she could qualify. While Sallion's deposition testimony regarding this matter is confusing, the following two points are clear: (1) Sallion understood Wittler had to choose a specific loan amount for the underwriters to consider; and (2) Sallion did not object when Wittler informed her the loan application would be submitted in the amount of $132,250. (Sallion Dep. at 107–108.) In addition, there is no indication Sallion ever asked Wittler to reduce the loan amount, even after the bank denied her application the first and second times.

Sallion implies SunTrust acted out of the ordinary by failing to go outside the requested loan amount to determine the highest amount for which Sallion could qualify. But Plaintiff has presented no evidence to suggest SunTrust ever operates in this manner, and the record contains ample evidence to suggest otherwise. Indeed, every SunTrust loan file Sallion has presented to the Court lists a specific loan amount for which the applicant sought qualification, and in every instance the underwriters did not stray from the requested loan amount by offering unsolicited statements regarding the loan applicants' qualification for a lesser amount. Indeed, only one loan file in the record evidences approval for a loan amount less than what the application originally requested, but

that occurred because the loan applicant reduced the loan amount by $13,000 and resubmitted the loan application after being denied the first time. (Pl.'s Ex. 26.)

## C. Claim Against Wittler

█ Although Sallion testified Wittler appeared "truthful, honest, and very up front" during the time they worked together on the loan application, (Sallion Dep. at 89–90), Sallion now claims Wittler "extended more assistance or advocacy to prospective borrowers of one race than another." (Pl.'s Resp. to Defs.' Facts ¶ 11.) But the five criticisms of Wittler's performance Sallion offers to support this claim offer no basis for a finding Wittler maintained such a discriminatory policy or, more importantly, that Wittler applied the policy to Sallion and treated her less favorably than white applicants.

First, Sallion blames Wittler for submitting the loan application for $132,250 and not explaining to the underwriters "that the amount of money the plaintiff sought was flexible." (Pl.'s Resp. to Defs.' Facts ¶ 10.) But as explained above, SunTrust did not stray from the specific loan amount listed on the application in an attempt to qualify applicants who would otherwise be rejected for smaller amounts.

Second, Sallion alleges Wittler "drafted a memorandum regarding [her] loan application for the underwriters which contains information that is simply false and that undermined her loan application." (Pl.'s Resp. to Defs.' Facts ¶ 10.) At her deposition, Sallion expressed disagreement with dates and facts Wittler recounted in a memorandum to SunTrust underwriters, but no reasonable juror could find the discrepancies material to Sallion's loan application. (Sallion Dep. at 92–97; Pl.'s Ex. 8 at 20045.) Nor could the memorandum and Sallion's testimony provide sufficient basis for a jury determination that Wittler intentionally offered a lower level of service to Sallion because of her race.

Third, Sallion alleges Wittler "failed to advise the underwriters of several factors present in [her] application which had been

used to compensate for high ratios in applications submitted by white applicants." (Pl.'s Resp. to Defs.' Facts ¶ 10.) But the six factors Sallion proceeds to list are facts readily ascertainable from the face of Sallion's application. In addition, there is no evidence Wittler ever took the time to highlight favorable portions of applications submitted by loan applicants outside the protected classes. Indeed, the record contains no evidence describing to any extent the level of services Wittler provided other loan applicants outside the protected classes.

Fourth, Sallion faults Wittler for not suggesting she could resubmit Sallion's application after Sallion had received the $1500 alimony payment for twelve months. (Pl.'s Resp. to Defs.' Facts ¶ 10.) But Sallion cannot escape the fact there is no evidence Wittler advised white applicants of every obvious scenario for obtaining qualification.

Finally, Sallion relies on a test performed by a local agency whereby two people (one white and one black) posed as prospective loan applicants, approached Wittler, and asked her questions regarding SunTrust mortgages. Wittler allegedly treated the black applicant less favorably by, for example, grabbing her hand only by the fingertips during their handshake and referring her almost immediately to a course for first-time home buyers. (Pl.'s Ex. 43.) Setting aside the subjective nature of the test and its inherent unreliability, the results do nothing to establish Wittler treated Sallion less favorably than white applicants during the application process.

## III. Conclusion

For the aforementioned reasons, the Court concludes reasonable jurors could not find Defendants discriminated against Plaintiff on the basis of her race or marital status either in the provision of services or in the determination Plaintiff was not qualified for a loan. Defendants' Motion for

Summary Judgment [39–1] is therefore **GRANTED.**